Okay, the next case is United States of America v. Michael Anthony Marcavage. Thank you. Mr. Shields. Thank you, Your Honor. May it please the Court. My name is Scott Shields. I'm here on behalf of Michael Marcavage. As the Court's aware, we're challenging the convictions of Mr. Marcavage for violating the terms of a permit issued, which wasn't actually issued, and for also interfering with an agency function. As the Court is aware from reading the briefs, this case arose out of a situation where Mr. Marcavage was Mr. Shields, do you want to reserve some time for rebuttal? Oh, I'm sorry, yes. And I had that right here at the top. If I could reserve three minutes for rebuttal. That request will be granted. Thank you. If I may, what occurred here, Mr. Marcavage was standing out on the sidewalk between Chestnut and Market Street on 6th Street, outside of what then was the entrance to the Liberty Belt. If the Court, and we filed a motion for the Court to admit the two videos, if the Court has looked at the videos and can see exactly what had occurred. He was standing on some Belgian block where nobody else would walk. There were some bollards. There was a sort of like a triangular advertising piece, almost like a realtor sign, that nobody could walk by anyway. But he was standing there. Well, the scene changed somewhat. I did my view this morning. He was standing there, but he was standing next to this advertising thing. But he was standing where the government even agreed nobody was walking. So what happened? I think we understand the facts. Okay. The issue here is Mr. Marcavage is found guilty of violating the terms of a permit issued. There was no permit applied for. The government relied upon a compendium, which both Ranger Saperstein and Chief Crane admitted had not even been put out into the field yet, where they had created a new free speech area somewhere over near Market Street. In the videos, the second video, that was Joint Appendix 2, 390, at 1.01 p.m. and 1.02 p.m., Ranger Saperstein said, look, you're not giving these people the opportunity to avoid hearing your message. So I'm issuing you a verbal permit to go to the other side of the building, which is now where the new entrance to the Liberty Building is. He said go to the grassy area just on the other side of the building. He didn't say to go to Market Street. Mr. Marcavage said, no, I'm just going to stand here because why can't I stand here when all of the breast cancer marchers are walking through? Why can't I stand here when all the horse carriage riders, they were standing where Mr. Marcavage was soliciting riders. Because of that, he gets arrested. All right. But they didn't have bullhorns. Well. Right. Don't you have a tougher, do you want to divide this case up into the bullhorn being a violation and then not? Or talk about that a little bit. What's the significance of the bullhorn? Well, I don't believe that there was any significance with the bullhorn for this reason. Somebody else other than Mr. Marcavage in the videos was using the bullhorn first. Then Mr. Marcavage was using the bullhorn. And there was a ranger there. You can hear Mr. Marcavage on the bullhorn. You can see a ranger standing just feet from where Mr. Marcavage was, who was talking to individuals who were asking, where's the entrance to the Liberty Building? When Mr. Marcavage was told you can't use the bullhorn, he stopped using the bullhorn. Yeah, that's what I took from the video, that he stopped using the, what, it was about two hours after he stopped using the bullhorn that he was arrested? Yes. So that the arrest could not possibly have been related to the bullhorn? Well, and even the compendium, it doesn't restrict the use of amplification. It was over two hours, was it? I believe it was somewhere between like an hour and a half to two hours. But it was long after he was told to stop using the bullhorn that he stopped using it. Oh yes, he absolutely stopped using it. Is there anything in this appendix that reflects that he ever left the Belgian block? Well, if you look at the videos, he did walk around to talk to some of the other people who were holding some pro-life signs to talk to them. And they were on the Belgian block too, at other locations? No, no. Like, there's no evidence, and the government didn't offer any evidence, that Mr. Marcavage stood and blocked the entrance to the Liberty Building. Well, the district court opinion, which was an R&R from the magistrate that the district court adopted, was that he choked, or the effect of him being there was choking entrance or exit from the Liberty Building. Well, that was the argument. The government kept saying that he was creating a choke point. But he was standing by himself. He was standing where everybody agreed nobody was walking. You look at the video, you can see where the entrance to the Liberty Building is. They have this one wrought iron gate that actually locks about half of the sidewalk. I believe the sidewalk is about 11 feet wide. So you have this big wrought iron gate that sticks out. Mr. Marcavage was standing next to this, I don't even know what you call it, but one of those triangular signs that's got the chains to keep it from spreading apart too far. So he wasn't creating a choke point anywhere. In fact, if you look at the video, and the evidence, and the testimony, there were lots of other people. There were thousands of people walking down that same sidewalk for the Breast Cancer March, the Susan Komen Breast Cancer Awareness March. How many more? Well, they were actually, there was somebody right down the way, right by the exit, closer to the Liberty Building than Mr. Marcavage, who you could hear on the video at the entrance. That's the person on the bike, the woman on the bike. Yes. One of the stationary people on the bike who was actually closer to the exit of the Liberty Building than the other people that were associated with Mr. Marcavage that were holding the signs. And it wasn't, just to correct the record, it wasn't thousands, right? Maybe there were hundreds of marchers, right? Well, actually, I believe there were, I mean, it was like an all-day event. I mean, it was a constant stream. The record reflects that, that there were thousands of marchers? Well, the record doesn't reflect the exact amount, but the video shows it was just a constant stream. And there were people in those lines, in that march, that were clapping. There were, you could see Rangers clapping for them, too. They had their pink shirts. Some of them had signs. Some of them had banners. And at trial on this matter, this was a two-day trial on French Judge Rappaport. Chief Crane said, we don't allow any free speech on 6th Street. In fact, you can stand there, you can talk to people, you can walk back and forth, but once you start expressing yourself, you need a permit. Which brings up the basic proposition that the magistrate judge held that this was a, well, alternatively, first of all, he heard it was a limited, non-public forum, and then a limited public forum. You disagree with both of those legal holdings? Respectfully, yes, I do. This particular sidewalk, and it was uncontradicted, this particular sidewalk is open to traffic 24-7. There's all sorts of activity that occurs right on that block. In fact, they allow, right up to the curb, those duck boats, they have their loudspeakers, listening riders, they have all the carriage riders. Does it matter how we categorize it if we apply the strictest test? If you apply the strictest test, well, it wouldn't, because if it was a non-public forum, the government would still have to show a compelling reason as to why they're restricting. Let me get to another basic. Are you making a facial or an as-applied challenge? Well, sort of a hybrid of both. This is unusual, because this particular compendium that was applied to Mr. Markavich, at 101 p.m. on 390, Joint Appendix 2, 390, Ranger Saperstein, who had been talking to Chief Crane about this new compendium, this is the new area. I didn't even know about it. And Chief Crane also confirmed that at trial, that they were still working on where they were going to have. So if there would have been a compendium in place that would have said there's an outright ban on 6th Street between Market and Chestnut, we would have gone in preemptively to seek an injunction to dissolve that ban so that we could go do this. So in essence, what happened here is you have a compendium that nobody really knew about. I mean, they had a compendium in place that did not ban free speech on 6th Street. The compendium that was offered didn't have this new place where you could only engage in free speech. But notwithstanding that, the area where Mr. Markavich was preaching was certainly open to all sorts of other types of expressive activity, including the marchers, including commercial activity. So there is sort of a facial challenge to it, but it's also as applied to Mr. Markavich because what the government has done, they've said, and it's our position that this was a content-based restriction. Ranger Saperstein said, to quote him, you're not giving them the option to not see your signs. They have no choice here but to see your signs and hear your message. That's why he issued the verbal permit. And who's ever heard of a verbal permit? The compendium requires a permit, and the courts have held permitting schemes are allowable if they're reasonable time, place, manner restrictions, which per se have to be content neutral, but that's to allow the orderly use of resources. You don't want two groups. If the verbal permit was improper, you still have the second charge. The obstructing, yes, but like we had the verbal permit, which was just our position is just government censorship. We just don't want you here. We give you a permit to go somewhere else. The interfering with the agency function. This was charged actually six months after the alleged offense. And it was our position that he wasn't doing anything that violated that particular regulation. He wasn't threatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty. Is the choke point, is that the basis for that CFR citation? Well, I'm not really sure because the CFR, although the government says there was a choke point, the evidence doesn't show any choke point, but it says a lawful order. And it was Mr. Mark Havage who was issued this verbal permit because they didn't like what he was saying. They said move. When he didn't move, then it was six months after the fact that he violated this lawful order. And the statute or the regulation says violating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during and then it lists firefighting operations, search and rescue, all that stuff. You only have a limited amount of time. Yes. So you say the restriction was content-based? Yes. What do you base that on? Well, I base that on what Chief Crane stated at trial and also what Ranger Saperstein said at trial and also what Ranger Byrne said. Ranger Byrne said people were upset by the message. Saperstein said the same thing. That was Ranger Byrne at page 129 of the Joint Appendix 2, page 69, Ranger Saperstein said the same thing. Chief Crane said there was just an outright ban on the video, and you can hear Ranger Saperstein clearly. He said at 101, he said the other side, I didn't even know about. At 102, he said you are not giving them the option to not see your signs. They have no choice here but to see your signs and hear your message. So, I mean, how could that not be content-based? If Mr. Markavich would have been standing there in a pink shirt, like the person on the bicycle, clapping and saying, yay, you know, we support you breast cancer marchers, we wouldn't be here. He would have never been arrested. Okay. Thank you. We'll have you back. Mr. Goldberg, may it please the Court, Richard Goldberg for the government. Your Honor, the government could not take more seriously the accusations that we have trampled the defendant's First Amendment rights, and of course, we are mindful that that incident occurred in the shadow of the Liberty Bell and Independence Hall. The evidence shows that these rangers pleaded with this defendant to get him to move away so they wouldn't have to take this action. This defendant, despite his claims, was subject to a regulation that applies to the park, applies to everybody in the park, including him. Well, he's on a public street here, and even though the street is adjacent to the Liberty Bell, my thought is that I think the district court improperly ruled that this was a limited public facility or a non-public forum. Since he's on a public street, even though it's in abutting the Liberty Bell, there are a number of Supreme Court cases of people on the sidewalk next to the Supreme Court, Congress, and they are allowed to hawk their wares or say their thing. I looked at the videos, as was related by my colleagues, and I don't see that he ever got off the Belgian block. As a matter of fact, I looked at your evidence, you had a number of pictures in the appendix, and every one of those pictures had him on the Belgian block, which was some distance away from the entrance. So I have a lot of problems with the holding that this was other than a public forum, and when you get a public forum, you have very limited First Amendment, you have broad First Amendment rights that the government can't interfere with. How do you think of it? What is this forum where he was standing on the Belgian block? It is a non-public forum, Your Honor, and this is the reason. Unlike Grace, the Supreme Court case, which the defense chiefly relies on, this sidewalk is so integral to the operation of the inside of the building, in fact when you stand, people standing inside the building could hear the bullhorn from outside, so it was interfering with programming inside the building. That is a red herring, the bullhorn. He was not arrested for the bullhorn. That's an afterthought. He was arrested, I can't tell exactly, but it's somewhere around two hours after he had stopped using the bullhorn and was told to move, so that's a little bit of a false argument. Well Your Honor, I'm addressing the nature of the forum, but let me get to the bullhorn for one second. He was told at 11.45 to get off the bullhorn. He was told at 12.10 to get off the bullhorn. He's still on the bullhorn at 12.35, photographed there, so, excuse me, that violation had occurred. It didn't vanish simply because the Rangers were still trying to negotiate the problem away, so that violation occurred. There was no regulation that prohibited any amplification in that area. There's no CFR, there's nothing, not even any sign that says you can't have the amplification, but the fact remains it appears to be, I can't tell exactly, about two hours after he had ceased using the bullhorn that he was arrested, so that can't be the raison d'etre for the arrest. Your Honor, there were, of course, multiple orders given after that. There was one at 1.10, one at 1.45, over and over again the defendant was told to move. The reason that there is no regulation as to bullhorns there is because there's no demonstration area in that particular narrow area, so that there would be no need to have a regulation specifically banning bullhorns if you can't have a demonstration there. Well, it's a sidewalk, and according to the Supreme Court, sidewalks, streets are public forms since times immemorial. Yes, Your Honor, and I suggest that this case is not as simple as that. For instance, in Grace, the Supreme Court was dealing with a large building set back from a city sidewalk that was not demarked in any particular way to be different from any other sidewalk. In this case, this building is surrounded by four-foot-high anti-terror bollards, most of which are chained together, so that it is clearly different. It is patrolled by rangers, and in fact, exactly what should happen happened here. Rangers approached the defendant to say, you're not, you haven't gotten a permit, this is not an area in which you can have this activity. Is all of Sixth Street encompassed by bollards all the way down to Market? No, but encompassing everywhere the defendant was. So the part of Sixth Street that doesn't have bollards is a public forum, but the part that does have bollards is a non-public forum? Your Honor, I would suggest that might be a more difficult case if the defendant were standing outside the bollards, which he was not. I'm asking you to tell us, what's the government's position? The government's position is that because that sidewalk is, that it is a non-public forum down to Market Street, because that sidewalk is used for the queuing of visitors. All right, so it can't be the bollards then, because you just told us the bollards don't go all the way to Market. Your Honor, I think the bollards are a part of that. I think that the entire area is so integral to the inside of the building, which this court has said is not a public forum. But the bollards are not made for pedestrians. They're to keep away a terrorist bomb, the bollards, that's a, they have all the, so that was not the pedestrian reason for it, that's to keep someone driving up with a bomb and bombing the building. But the fact remains, he never got off the Belgian block, which is right next to the curb, and I fail to see that his being there in any way interfered with people exiting or entering the facility. Your Honor, the photographs show and the testimony of the rangers who are experienced in park management and the safe operation of that building was that his presence so close to that entrance, and there were two bollards in the sidewalk there, an additional bollard, an iron gate that closed out so that the passage for pedestrians caused by this defendant, the passage for pedestrians to go up the street had narrowed to essentially one lane so that you could see in the video where people had a hard time moving up and down the street, and that caused people to stop in front of the entrance. The reason it narrowed to one lane is because you have a gate that opens seven feet into an 11-foot sidewalk. Your Honor, I understand that, and I might have designed the gate differently, but I suggest that, as the Supreme Court noted in its Clark decision, that the park has to be allowed to manage the parks. Well, what about Exhibit 16? I mean, there's a lady holding a horse, and she's standing in the Belgian block. So was she obstructing the passage? No, Your Honor. She was on Fifth Street. There was no entrance there. She was actually at the back of a building, and, in fact, a ranger testified that she should not have been allowed to stand there. And if it's a nonpublic forum, then, if we accept your argument it's a nonpublic forum, then does someone need a permit, or could someone get a permit to speak on that street? On Sixth. On Sixth Street? No, Your Honor. And the reason for that is because the crowds are so heavy, the rangers need to give instructions to people there. They need to clear that entrance. And, of course, as— Then why were the marchers allowed to go down Sixth Street for hour upon hour? Because, Your Honor, they are moving pedestrians. They are not standing there obstructing the doorway. So two hours of a steady stream, or more—was it more than two? How long was the march going on? Record does not say, Your Honor. Okay. Do we know that it was at least—I mean, it appeared to be steady throughout the videos, at least, and that was a couple hours. Frankly, Your Honor, I don't even—the record doesn't indicate how to identify who's a marcher and who's a visitor or who's anybody walking down the street. So it's very hard to tell. The distinction, however, is that the marchers were moving so that pedestrians can walk down the street. So if Mr. Markavich had been—instead of—your argument is that his standing stationary on the Belgian block was more obtrusive than if he had walked up and down the Sixth Street sidewalk. Yes, Your Honor. Because his steady presence there, narrowing that passageway, made it more difficult and, in fact, finally obstructed the entrance, as a final effect. People didn't walk on the Belgian block. People walk on the slate, which abuts the Belgian block. He was on the Belgian block next to the curb. And I don't see how his standing there—I look at the videos and, you know, we've also passed the area coming to court—how he could be obstructing anyone coming or going when he's standing on the Belgian block. Your Honor, as you will see in the video, he was standing directly off the slate, not by the curb. And people are walking on the slate. I saw no one walking on the Belgian block. That's a little difficult to walk on. I respectfully disagree, Your Honor. There are many times in which the crowds get so large that people do have to walk on the Belgian block. They couldn't because the defendant was there. He was there with others in his group, people holding posters, which further obstructed the sidewalk there. Well, let's get back to the basics. Your position is that this is a limited public or a non-public forum. Yes. How do you reconcile that with Supreme Court cases which say that the streets and the sidewalks are public fora and that you cannot limit them, except for the most horrendous of decisions, that it's got to be the least possible way of limiting access? And there's nothing here that indicates that there was anything that prevented him from using amplification, even though this record, when I read it, did not justify him being arrested for the bullhorn because it happened several hours later. But be that as it may, how can this be other than a public forum when people are using this to go up and down Philadelphia all over the place? This is not like the cases you cited where there was a street going into a post office or a street going into like Fort Dix, the main case. This is a street which people traverse for going to work and wherever they're going without limitation. That's right. If it is a public, if it is not a restricted forum, then how do you justify disallowing him from standing on the Belgian block and saying whatever he wants to say? Your Honor, on the first point, in Heffron, the Supreme Court indicated that you look at the nature and purpose of the particular property and that this, the lower court looked at the interior of the property and how proximate this sidewalk was. If you can be, if this sidewalk is so close that you can essentially affect the operation inside the nonpublic forum, then the nature of the sidewalk is such that it is part of the interior. And the government suggests that the court look at Greer, the Supreme Court, Fort Dix case. This property is very much like the property in Greer. It's inside a federal enclave. There are streets and sidewalks that are free and open to passage. But the Supreme Court and Congress sidewalk abuts those facilities. And they were held to be public forum. Yes, Your Honor, and I again try and distinguish grace by saying that the regulation there dealt with flags and banners, which would have no impact on the interior of the building. I think that's a red herring because even if it's a public forum, they can regulate the park service that is. What goes on in the public forum, as long as that's a content neutral time, place, and manner regulation, and that would cover things like someone with a bullhorn that would disrupting programs inside the building. So I'm not sure I appreciate why you're making that argument. I mean, well, Your Honor, and I will get to that. I guess my point quite simply is, isn't there a distinction, a very important distinction between someone who's speaking with amplification that could disturb programming and someone who's simply standing there on the Belgian block holding a sign or speaking in a normal tone of voice? There is a distinction between somebody using a bullhorn, as this defendant was, although he'd been told not to. But this defendant was in a place where he was creating a safety hazard, so that the second prong of the court's decision, which was to examine this as a public forum, was to say that it's a reasonable time, place, and manner restriction. Can't you still prevail? Absolutely, Your Honor. Either way, it doesn't matter, frankly. Let's assume this is, let's assume we find this is a public forum. Yes, Your Honor. And we're looking at, was the... I'm concerned about whether or not this erection was content-based. Your Honor, the rangers testified. They're not blind. They could see that people were upset with what this defendant was doing. But that was not the basis of their actions. That goes to the heart of his message. What if the people waiting in line were upset by the marchers? Then you're going to silence the marchers and allow Mr. Markavich? I mean, that's picking and choosing whose message you like, isn't it? No, Your Honor. There was no picking and choosing. The marchers were not presenting any hazard to the operation of the building. Only Mr. Markavich was. But you just said it was because he made people upset. No, I said that they, the rangers simply reported what they were seeing. But they didn't move him. They didn't exclude him from the park because of that. And the credibility determination made by the finder of fact was that this was not a content-based decision. In fact, they have defended Mr. Markavich at other protests. They have not in any way indicated that they censored him because of his message. They simply wanted to move his message less than a block away to an area that has more traffic, more population, more vehicles, more visitors, and gave him an ample alternative. If it is a public forum, then you have to have the least restrictive regulations. For instance, you could have limited the number of people that could demonstrate. You could have limited whether they could use amplification, the hours. But you had none of that regulation here. If this is a public forum and there's no regulation that restricts anything except, you know, what they want to do, how can that stand if we determine that this is a public forum? Because there's got to be the least most restrictive type of laws here. And you could have limited the number of people, the time, the place, but that's not what you have here. Well, Your Honor, there are two answers to that. One is that the Supreme Court in Ward said that there is no least restrictive analysis that applies in time, place, or matter cases. And second, that this was one defendant. If one defendant creates this kind of blockage, then what other analysis could there be? And the blockage was he prevented people from entering the, what is specifically, what is the blockage or the choke that he did? He narrowed the sidewalk. By standing on the Belgian block. By standing just off the sidewalk on the Belgian block. There are people, they're not necessarily able-bodied people trying to get up and down the sidewalk. And as people congregate, as the crowd gets big on the sidewalk to enter the building, as an unscheduled, unknown march comes through, as people try to pass through there, a large group is now in front of the entrance. How about all the people that are renting out the horses and the vendors and so forth that are also on the Belgian block? They are not, Your Honor. There is no evidence that any of those people were on park property and the lower court found explicitly to the contrary. Those people are all off park property on 6th Street. Oh, they were on the street itself. You're saying that the people that drove the horses didn't stand on the Belgian block. That's correct, Your Honor. And if they were, they were not permitted to do so. And either were or should have been told to get off the Belgian block. So that it's really just a question of the competing needs of this park. With 2 million visitors and 100,000 demonstrators, counter demonstrators, this defendant has to be treated like every other demonstrator. Mr. Goldberg, let's go back to a basic issue. Do you still stand on the fact that there is sufficient evidence to convict Mr. Marcavage of violating an oral permit? Your Honor, absolutely, Your Honor. Even though the regulations in 1.4a define permit as a written authorization? Your Honor, I am not aware of that requirement. I think that the denial, the denial has to be in writing. The permit does not have to be in writing. How do you know what the permit, the oral permit is for? They differ as to... It defines it as a written authorization to engage in the uses or activities which are otherwise prohibited, restricted, or regulated. Your Honor, I ask leave to, this has never been raised before this particular matter. So I ask leave to... We're looking at, we have the opportunity, we have the obligation to look at the regulations. And I appreciate that, Your Honor, because I want, you know, the government wants to get it right. But the oral permit is granted to defendants in order to further foster First Amendment activity. So that rather than having a ranger say, you didn't file for a permit, you have to leave, that the ranger will follow the compendium, follow the criterion, and further facilitate First Amendment activity. Yeah, but what are the conditions and provisions of an oral license? Exactly what's in the written compendium, exactly what a written permit would say, which is, this is the area, these are the rules in this particular area. You now have a permit. If we decide that this is a public forum, does he need a license written or oral at all? If we say the street and sidewalk is a public forum? The Code of Federal Regulations requires a permit, Your Honor. The CFR requires it, but CFR doesn't preempt these constitution. If we decide under the First Amendment, this is a public forum, does he need a permit, oral or written, to stand on the Belgian block and preach? He does, Your Honor. And this Court has recognized that permitting schemes are an appropriate way for governments. We've never recognized an oral permit, as far as I know. Well, Your Honor, I suggest that the oral permit is a little bit of a different kind of red herring, because the oral permit is done to facilitate First Amendment activity, to foster it, as opposed to requiring a written permit. It's to say to someone, you haven't complied, but we're still going to try and enable you to speak. But the permitting process itself in Starzell is a process that this Court explicitly authorized. Your basic point is that if this is a public forum, a public forum that opens to the public, that he nevertheless needs a permit if the Park Service says he has to have a permit to preach on the Belgian block. Your Honor, he does so that the park can properly be managed. And both the Supreme Court and this Court have said that because of the competing uses on parks and sidewalks and streets, that permitting is a proper way for the Park Service to regulate as long as speech is not suppressed. And the oral permit is to make sure that the government is bending over backwards. And I don't know that any other park would not have ordered Mr. Markavich out because he didn't have a written permit. But this park tried to have him be able to speak in an appropriate location where he could better get his message out to the public, still within the park, and far less than a distance than this Court approved in the Starzell case. What about the signs? I mean, you know, it's one thing to tell Mr. Markavich to move up to the corner near Mark, but what about the signs? Weren't they also directing him to take all of his signs? No, Your Honor. The only person who was addressed was Mr. Markavich. The only demonstration that they ever discussed with him was the one directly at the entrance to the building and the exit to the building. Okay, so... Those other people, they were not, there was no discussion with them. There was no discussion about them. So for us, in analyzing the content-based nature of the directive... Exactly, Your Honor. ...the signs really are irrelevant because there was no directive to move those signs. Your Honor, I think they're very relevant. They show that it's not content-based. Because if it had been content-based, they would have, the Rangers would have had a problem with the sign. All right, yeah, correct. But they had no problem with them, just with the operations at the entrance and the exit. If we disagree with the two lower courts' legal conclusion that this is a non-public forum, what's the remedy? Should we just vacate the conviction and remand, or should we decide the whole case? What's the government's view on that? Your Honor, you should affirm. Because there is a second, the second prong, which is that even in a public forum, that this was a reasonable grounds to cite this defendant because he was creating a safety hazard, because he had violated the order to stop using the bullhorn. We shouldn't give the district court the chance to analyze that in the first instance under the different legal principles that would apply if it were a public forum? Your Honor, both courts analyzed the question in the alternative. And both courts found that even as a public forum, that these were appropriate time, place, and manner restrictions, appropriate citations, and that the defendant was causing a safety hazard. And for that reason that he had violated both the order to stop using the bullhorn and not to move. Mr. Goldberg, I think we understand your argument. Thank you, Your Honor. Mr. McShield, thank you. What we have here, and the court is correct, you look at those videos, Mr. Markavich wasn't blocking anybody. And had he been blocking anybody, they could have said, can you move just two feet back something? But they arrested him because they didn't like what he said. When we talk about content-based restrictions, the court, Judge Rappaport, who largely adopted the proposed findings of fact of the government, findings of fact number 13, talks about the Breast Cancer Awareness March was proceeded. Where is that? I'm looking at the brief at page 20, I don't... Okay, you got it in your brief. Yes, it's in the brief. Because we challenged each one of the findings of fact, because we believe they were all erroneous as they were applied to Mr. Markavich. This was sort of like a conviction that was going to occur, notwithstanding what actually occurred that day. Because everybody else was allowed to engage in whatever type of expressive activity they wanted to, except for Michael Markavich. And you can see in the video, the horse carriage operators holding the reins of their horses standing on the Belgian block. Yeah, absolutely. Yeah, well, you should have pled equal rights. Well, we actually have a civil suit that's pending as well as a result of this. Yeah, but you didn't do that in that case. We're only dealing with First Amendment here. Right, so we have... The government talks about reasonable time, place, manner restrictions. Reasonable time, place, manner restrictions regulations, somebody should know about them. And they were silent as to Sixth Street. But even if they did have what they call reasonable time, place, manner restrictions, those restrictions have to be narrowly tailored. And they can't restrict more speech than is necessary to achieve that significant interest that the government is... All they said was go up to the corner. They didn't say that. They said, go to the other side of the building. They didn't tell him to go to the video. Ranger Saperstein said, there's a new area I didn't even know about. It's on the other side of the building. And you can see him, the grassy area on the other side of the building. The free speech area, which was reserved for... Yeah. Well, it wasn't... Nobody knew about it. The Rangers didn't even know about it. It wasn't far, it was within... It was the other side of the building. But the marchers weren't there. The marchers weren't told to go to the other side of the building either. Nor were the people that he wanted to preach to. Exactly. He was preaching to an empty field if he went over there. Exactly. And he didn't want to do that. But the government wanted to put him in a closet. And that's what this was all about. That's why they arrested him. When we talk about content-based restrictions, the court... Well, wait a minute. What about the bullhorn issue? Because opposing counsel made an interesting point. I mean, there was a disobedience of the first order not to use the bullhorn. I mean, Judge Cowan has pointed out that there was a substantial lapse of time between the time your client was arrested and his last use of the bullhorn. But isn't it a fact, as found by the trial court, that he used the bullhorn in violation of the order to cease and desist while doing so? He didn't. And we dispute that. Didn't he use the bullhorn three times? There was another person in the video that was using the bullhorn the first time. He stopped and then Mr. Markavich used it. And I think he was told the first time and Mr. Markavich asked, why? Why can't I use it? I'm not loud. You can see him using the bullhorn on the video. Well, but there was a finding of fact. And I think it was Ranger Byrne testified that it was disrupting programming inside. And I couldn't find any testimony to rebut that. She didn't know who was using the bullhorn. She also said that. She didn't know who was using the bullhorn. Well, but it's still a fact that the bullhorn was disrupting what was going on inside the building. She said that. But actually, if you look at the video, Ranger Byrne was standing right next to Mr. Markavich when you could see visitors coming up. Where's the entrance? Oh, the entrance is right here. You can hear Mr. Markavich. And it wasn't very loud. You can hear Mr. Markavich using the bullhorn. You can also hear Ranger Byrne giving clear directions to other individuals. Ranger Byrne did testify that she could hear somebody on a bullhorn outside, but also admitted she didn't know who it was. She didn't know who it was. But there was still no restriction. Those duck boats are a lot louder than that bullhorn. The buses and the cars and the horns honking. There's all sorts of activity that goes on on 6th Street. To get back to the content-based restriction, findings of fact number 15. The court said, at the time defendant was engaged in protest activities, the 6th Street sidewalk was also busy with pedestrian traffic and was a site of queue for park visitors awaiting to see the Liberty Bell. These visitors had no choice but to experience defendant's protest activities. The court also specifically rejected the one proposed findings of fact of the government. And that was that Mr. Markavich was creating a public hazard. The court rejected that. In fact, even the Rangers admitted that he really wasn't doing anything. He wasn't harming anybody. This was really all about what he had to say. And for those reasons, we're asking that these convictions be vacated. Okay. We thank counsel. Thank you. We thank counsel. We'll take the matter under advisement. Counsel, thank you for your excellent arguments.